[12 NYS3d 206]

In the Matter of ANTHONY C. COLUZZI, a Suspended Attorney, Respondent. GRIEVANCE COMMITTEE FOR THE TENTH JUDICIAL DISTRICT, Petitioner.

Second Department, June 24, 2015

## APPEARANCES OF COUNSEL

*Mitchell T. Borkowsky*, Hauppauge (*Ian P. Barry* of counsel), for petitioner.

*Long Tuminello, LLP*, Bay Shore (*David Besso* and *Michelle Aulivola* of counsel), for respondent.

## OPINION OF THE COURT

Per Curiam.

The Grievance Committee for the Tenth Judicial District served the respondent with a verified petition dated November 14, 2013, containing five charges of professional misconduct. After a preliminary conference on June 11, 2014, and a hearing on August 12, 2014, the Special Referee sustained all five charges. The petitioner now moves to confirm the Special Referee's report, and to impose such discipline on the respondent as this Court deems appropriate. In response, the respondent, by his attorney, submitted an affirmation seeking to clarify certain facts and circumstances relating to charge two, which may have been misapprehended or misinterpreted by the Special Referee. Further, based upon the evidence adduced at the hearing, including the mitigating factors, the respondent requests that the Court limit any period of suspension to the length of time already served from the effective date of his immediate suspension.

The charges in the petition emanate from a complaint filed on behalf of Louise Becker and a sua sponte complaint based on a civil action commenced by Diane Weidler. Based upon the respondent's admissions, his sworn testimony, and the evidence adduced, the facts are as follows:

### The Becker Sale

In or about May 2006, the respondent was asked by an acquaintance, Lorraine Soukup, to assist her mother, Louise

Becker, in the sale of her home located in Southhold. Although the respondent was practicing law, he was also in the business of buying homes and refurbishing them for resale. The respondent and Ms. Soukup visited the Southold property, and met with her parents, Mr. and Mrs. Becker. At that time, the Southhold property was "free and clear" of any mortgages or liens. The property had been owned by Mr. and Mrs. Becker until Mr. Becker started to experience health-related problems, and a determination was made to transfer title solely to Mrs. Becker. Given Mr. Becker's declining health, the Beckers were intending to sell the Southold property and relocate to a more manageable residence. The respondent was advised by Mrs. Becker that she wanted to net $500,000 from the sale. Mrs. Becker declined the respondent's offer to formally list the property with his real estate brokerage firm, Brookfield Realty; however, he agreed to help her find an interested buyer.

Following his meeting with the Beckers, the respondent researched comparable home sales in the Southold area, and determined that Mrs. Becker's property had an estimated market value between $580,000 and $610,000. The respondent did not inform Mrs. Becker of his findings.

Having been unable to generate any interest in the property, the respondent discussed the sale with his friend, Rosario Pisano, whom he knew was interested in investing in real estate. Mr. Pisano and the respondent visited the Southold property and met with the Beckers. Thereafter, Mr. Pisano agreed to purchase the property and pay Mrs. Becker $500,000.

In or about July 2006, as the attorney for Mrs. Becker, the respondent prepared the contract of sale. The terms of the contract provided for no down payment, and a sales price of $620,000, notwithstanding the $500,000 sales price agreed upon by the parties. The sole purpose of inflating the sales price was to enable Mr. Pisano to obtain a mortgage loan in an amount sufficient to permit him to pay Mrs. Becker the agreed $500,000, without Mr. Pisano contributing any of his own funds. To achieve this end, the deal was structured such that Mrs. Becker would give Mr. Pisano a "gift of equity" of $62,000. Mr. Pisano was not represented by an attorney for this transaction. The contract was signed by all parties in Mrs. Becker's living room.

Mr. Pisano thereafter applied to a mortgage lender, Mortgage It, Inc., for a loan in the amount of $566,000, based upon the $620,000 purchase price reflected in the contract. In fact, an

appraisal conducted on behalf of the lending institution valued the property between $640,000 and $645,000. Unable to provide the lender with documentation evidencing Mr. Pisano's "personal financial interest" in the transaction under the gift of equity, it was agreed that Mrs. Becker would hold a "note" reflecting the difference between the actual purchase price ($500,000), and the contract purchase price ($620,000). The "note" would show, at least on paper, that Mr. Pisano was liable to Mrs. Becker in an amount sufficient to cover the difference, without him contributing any of his own funds.

The respondent's knowledge of, and complicity in, the foregoing misrepresentations (e.g., the inflated sales price and the illusory seller's-held note and mortgage) to the purchaser's lending institution, is reflected in a letter dated August 9, 2006, to his client confirming the terms of the transaction. Therein, the respondent indicated that, although the "actual" purchase price was $500,000, the contract of sale would reflect a purchase price of $620,000, so that the purchaser could obtain a mortgage loan in the amount of $566,000. Further, the respondent advised Mrs. Becker that she would not be entitled to any monies above and beyond $500,000, including any funds from a second mortgage. This letter, which the respondent described as a "hold harmless" letter, clearly evidences the respondent's knowledge that Mr. Pisano never intended to pay Mrs. Becker the funds due under the seller's-held note.

On August 11, 2006, Mrs. Becker executed, and the respondent acknowledged, a bargain and sale deed with covenants conveying title to her home to Mr. Pisano. Also on that day, Mrs. Becker executed a general power of attorney naming her daughter, Ms. Soukup, as attorney-in-fact so that she could attend the closing on behalf of her mother.

On September 13, 2006, Pisano executed a "note" in Mrs. Becker's favor, in the amount of $62,900. The document was notarized by the respondent, and provided to the lender in furtherance of Mr. Pisano's application for a first mortgage loan in the amount of $566,000. Despite a clause stating that the "note" was to be secured by a "security instrument," the document was never secured, as no mortgage was ever drafted by the respondent.

At the closing of sale on September 26, 2006, Ms. Soukup appeared as her mother's attorney-in-fact. According to the relevant HUD-1 Settlement Statement (hereinafter the HUD-1), the contract sales price was indicated as $620,000, and the

transaction included a seller's "concession" of $24,220.72, as well as a seller's held second mortgage in the amount of $62,900. The loan was funded the following day, September 27, 2006, and the respondent received six checks made payable to Mrs. Becker, totaling $496,849. The respondent also received a check for his fee in the amount of $1,950. The remaining mortgage proceeds, after costs, in the amount of $40,339.78 were paid to the respondent, "as attorney."

On September 27, 2006, the respondent delivered the six checks that were made payable to Mrs. Becker to her new residence and left them with Ms. Soukup. At that time, the respondent presented Ms. Soukup with a letter "forgiving" Mr. Pisano's $62,900 "note," which she signed, as attorney-in-fact for Mrs. Becker. Accordingly, the day after the closing, Mr. Pisano's obligation to make further payments to Mrs. Becker, which was a prerequisite for his obtaining a first mortgage loan, was forgiven in its entirety, unbeknownst to the lender. The respondent deposited the check drawn to him as attorney in the amount of $40,339.78 into his IOLA account, and thereafter released the full amount to Mr. Pisano on or about September 28, 2006. Sometime thereafter, it was discovered that Ms. Soukup had negotiated the six checks without her mother's consent.

In or about March 2007, the Southold property was offered for sale by Mr. Pisano for $720,000. The record reflects that, at that time, Mr. Pisano considered a sale of the Southold property to himself and three other partners, one being the respondent.

### The Diane Weidler Matter

In or about March 2007, the respondent recommended that Diane Weidler purchase a property located in Bay Shore, for investment purposes. Ms. Weidler and the respondent had been acquaintances for approximately 20 years. Although Ms. Weidler knew the respondent to be a real estate attorney and a real estate broker, at no time did the respondent indicate to her that he was acting as a real estate broker in the subject transaction, or that he was to have any role therein. Moreover, at no time did the two agree to be "partners" in the transaction. Although the respondent recommended another attorney to represent Ms. Weidler, he personally drafted the contract of sale, listing a sales price of $440,000. The respondent thereafter utilized his personal business contacts to secure a mortgage loan for Ms. Weidler, as the purchaser.

At the closing, which occurred on or about April 30, 2007, Ms. Weidler received a principal loan in the amount of $440,000, as reflected on the HUD-1. The respondent was not listed on the HUD-1 as receiving any funds, even though he received a check from the proceeds of the loan in the amount of $72,041.82. This check was made payable to "ACPH, Inc.," the respondent's wholly-owned real estate brokerage company. Although Ms. Weidler objected to this payment to the respondent's company, the real estate broker, who was another acquaintance of the respondent, advised her that the respondent was Ms. Weidler's "partner" in the transaction, and that he was entitled to a "cash out."

Following the closing, Ms. Weidler learned that the respondent and the seller had entered into a secret agreement whereby the respondent would be entitled to the balance of any money paid for the property over $340,000 in the event that he secured a purchaser for the property. This agreement was not in writing, and was never disclosed to Ms. Weidler. Moreover, unbeknownst to Ms. Weidler, at the time she signed the contract of sale, which reflected a sales price of $440,000, the property was, in fact, listed for sale at $369,000. Thus, the respondent artificially inflated the contract price in order to profit from the excess amount paid for the property.

Ms. Weidler commenced an action against the respondent and others in the Supreme Court, Nassau County, alleging that they had defrauded her in the subject transaction (see Weidler v Coluzzi, Sup Ct, Nassau County, June 24, 2010, Warshawsky, J., index No. 011303/07). On or about June 1, 2010, following a jury trial, the respondent was found civilly liable for fraud in the inducement, fraud by concealment, and breach of fiduciary duty. Additionally, the court rendered a nonjury verdict finding the respondent civilly liable on the ground of unjust enrichment. On August 5, 2010, a judgment was entered in favor of Ms. Weidler and against the respondent in the amount of $94,730.25, which was satisfied by the respondent.

Based upon the foregoing facts, charge one alleges that the respondent engaged in conduct involving dishonesty, fraud, deceit, and misrepresentation, in violation of the former Code of Professional Responsibility DR 1-102 (a) (4) (22 NYCRR 1200.3 [a] [4]); charge two alleges that the respondent engaged in a conflict of interest in his representation of a client, in violation of the former Code of Professional Responsibility DR 5-101 (a) (22 NYCRR 1200.20 [a]); charge three alleges that

the respondent engaged in conduct that adversely reflects on his fitness as a lawyer, in violation of the former Code of Professional Responsibility DR 1-102 (a) (7) (22 NYCRR 1200.3 [a] [7]); charge four alleges that the respondent engaged in conduct involving dishonesty, fraud, deceit, and misrepresentation, in violation of the former Code of Professional Responsibility DR 1-102 (a) (4) (22 NYCRR 1200.3 [a] [4]); and charge five alleges that the respondent engaged in conduct that adversely reflects on his fitness as a lawyer, in violation of the former Code of Professional Responsibility DR 1-102 (a) (7) (22 NYCRR 1200.3 [a] [7]).

With respect to the Becker sale, the Special Referee properly found that, based upon the credible evidence, the respondent engaged in conduct involving dishonesty, fraud, deceit, and misrepresentation as alleged in charge one. As reflected in the HUD-1, the respondent's presentation to the lender of the contract of sale with an inflated sales price and the illusory second mortgage and note held by the seller, misrepresented the true terms of sale. The Special Referee properly concluded that the "forgiveness of the note" immediately after the closing and delivery of the checks for the true proceeds belied any explanation other than fraud on the mortgage lender.

With respect to charge two, the Special Referee found, and we agree, that the respondent's conduct in representing Mrs. Becker constituted a conflict of interest. While representing Mrs. Becker in the sale of her home, the respondent secured Mr. Pisano as the purchaser and structured the transaction in the best interest of Mr. Pisano, with whom he enjoyed a preexisting business relationship. Further, as revealed in the respondent's deposition testimony in the *Weidler* action, the respondent and Mr. Pisano, were "partners" in the planned sale of Mrs. Becker's property with an asking price of $720,000.

Concerning charges four and five, which involve the transaction that was the subject of the *Weidler* action, the Special Referee correctly concluded that, inasmuch as the respondent had a full opportunity to litigate the issues in that action, he is collaterally estopped from contesting the findings therein (*see Matter of Dunn*, 24 NY3d 699 [2015]; *Kaufman v Eli Lilly & Co.*, 65 NY2d 449 [1985]). As the judgment in the *Weidler* action was based upon findings that the respondent was civilly liable for fraud in the inducement, fraud by concealment, and breach of fiduciary duty, the judgment established that the respondent engaged in conduct involving dishonesty, fraud,

deceit, and misrepresentation, which is conduct that adversely reflects on his fitness as a lawyer, as alleged in charges four and five of the petition.

We find that the Special Referee properly concluded that the respondent engaged in conduct involving dishonesty, fraud, deceit, and misrepresentation, in violation of former Code of Professional Responsibility DR 1-102 (a) (4) (22 NYCRR 1200.3 [a] [4]) in both the Becker and Weidler transactions; that he engaged in a conflict of interest in his representation of Mrs. Becker by allowing his own financial and personal interests to adversely affect his representation of her, in violation of the former Code of Professional Responsibility DR 5-101 (a) (22 NYCRR 1200.20 [a]), and that his conduct in both the Becker and Weidler transactions adversely reflects on his fitness as a lawyer, in violation of the former Code of Professional Responsibility DR 1-102 (a) (7) (22 NYCRR 1200.3 [a] [7]). Accordingly, all charges are sustained, and the Grievance Committee's motion to confirm the report of the Special Referee is granted.

The respondent urges this Court to impose a sanction which limits any period of suspension to the length of time already served from the effective date of his immediate suspension. In mitigation, he submitted evidence of his service as a volunteer with a charity, as well as his good character. Nevertheless, the respondent engaged in serious misconduct, including fraud, dishonesty, deceit, and misrepresentation, in both of the real estate transactions involved herein, and engaged in a conflict of interest in his representation of Mrs. Becker in the sale of her home. Moreover, the respondent does not exhibit any remorse for his actions, and has a prior disciplinary history, having received a personally delivered letter of admonition for his misuse of client funds.

Under the totality of the circumstances, we find that the respondent's conduct warrants his suspension from the practice of law for a period of three years, with no credit for the time he has served from the effective date of his immediate suspension.

ENG, P.J., MASTRO, RIVERA, SKELOS and LEVENTHAL, JJ., concur.

Ordered that the petitioner's motion to confirm the Special Referee's report is granted; and it is further,

Ordered that the respondent, Anthony C. Coluzzi, is suspended from the practice of law for a period of three years, ef-

fective immediately, and continuing until further order of this Court. The respondent shall not apply for reinstatement earlier than December 22, 2017. In such application, the respondent shall furnish satisfactory proof that during said period he: (1) refrained from practicing or attempting to practice law, (2) fully complied with this order and with the terms and provisions of the written rules governing the conduct of disbarred, suspended, and resigned attorneys (*see* 22 NYCRR 691.10), (3) complied with the applicable continuing legal education requirements of 22 NYCRR 691.11 (c) (2), and (4) otherwise properly conducted himself; and it is further,

Ordered that the respondent, Anthony C. Coluzzi, shall continue to comply with this Court's rules governing the conduct of disbarred, suspended, and resigned attorneys (22 NYCRR 691.10); and it is further,

Ordered that pursuant to Judiciary Law § 90, during the period of suspension and until the further order of this Court, the respondent, Anthony C. Coluzzi, shall continue to desist and refrain from (1) practicing law in any form, either as principal or as agent, clerk, or employee of another, (2) appearing as an attorney or counselor-at-law before any court, judge, justice, board, commission, or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding himself out in any way as an attorney and counselor-at-law; and it is further,

Ordered that if the respondent, Anthony C. Coluzzi, has been issued a secure pass by the Office of Court Administration, it shall be returned forthwith to the issuing agency, and the respondent shall certify to the same in his affidavit of compliance pursuant to 22 NYCRR 691.10 (f).